UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Michael De Angelis,
     Plaintiff

     v.                              Civil No. 04-cv-456-SM
                                         Opinion No. 2008 DNH 013
Officer Steve Beaudoin; Sergeant
Angela Boyer; Sergeant Thomas Dalton;
Captain David Dionne; Sergeant Todd Gordon;
Officer John Leduc; Classification Supervisor
William Raymond; Lieutenant Michael Robbins;
Officer Luis Torres; and Former Lieutenant
Gerard Morrissett,
     Defendants

**O R D E R**

Pro se plaintiff, Michael De Angelis, is a former pre-trial detainee at the Hillsborough County House of Corrections ("HCHC") in Manchester, New Hampshire. After conducting a preliminary review of De Angelis's first amended complaint, the Magistrate Judge concluded that it advanced four viable federal claims: (1) an Eighth Amendment excessive force claim against defendants Leduc, Beaudoin, Gordon, and Torres; (2) an Eighth Amendment claim against defendants Gordon and Robbins based upon unsanitary conditions of confinement; (3) an Eighth Amendment failure to protect claim against defendant Raymond; and (4) a First Amendment retaliation claim against defendants Raymond, Dionne,

Boyer, Dalton, and Morrissette.  Report and Recommendation
(document no. 31).

Subsequently, De Angelis again amended his complaint,
asserting new claims against Superintendent James O'Mara and
Lieutenant John Sullivan.  Plaintiff claims O'Mara and Sullivan
taunted and threatened him in an effort to have him withdraw this
lawsuit.  Charitably construed, plaintiff's second amended
complaint advances a First Amendment retaliation claim, as well
as state law claims for assault and battery over which plaintiff
presumably seeks to have this court exercise supplemental
jurisdiction.

The defendants named in De Angelis's original complaint and
the first amended complaint move for summary judgment, asserting
that there are no genuinely disputed material facts and saying
they are entitled to judgment as a matter of law.  Plaintiff
objects.  The defendants added in plaintiff's second amended
complaint — O'Mara and Sullivan — move to dismiss plaintiff's
claims against them, saying that although counsel repeatedly
informed plaintiff that he had not properly served those
defendants, plaintiff never served them with his second amended
complaint.  Plaintiff has neither responded (by, for example,

2

attempting to properly serve those defendants), nor has he objected to their motion to dismiss.

### Background

Although plaintiff has objected to defendants' motion for summary judgment, he has failed to support that objection with any affidavits, depositions, hearing transcripts, etc. Nor has he identified those material facts he believes are in dispute. Instead, he has merely spoken in vague and general terms, asserting that "there [are] genuine issues as to material fact that a jury may return a verdict for the plaintiff. Defendants are not entitled to summary judgment or immunity because their actions were done under color of state law. The facts are in dispute between both parties." Plaintiff's objection (document no. 144) at 1. See also Plaintiff's Sur-reply (document no. 153) at 2. Accordingly, the court will accept as true all properly supported facts set forth in defendants' memorandum. See N.H. Dist. Ct. Local Rule 7.2(b)(2) ("A memorandum in opposition to a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial. All properly supported material facts set forth in the moving party's factual statement

3

shall be deemed admitted unless properly opposed by the adverse party.").

While the relevant factual background to each of plaintiff's claims is set forth in detail in defendants' memorandum and the accompanying affidavits and exhibits, the facts can be summarized as follows.

I.    The October 5, 2004 Incident.

In September of 2004, plaintiff asked to be placed into protective custody, telling HCHC staff that "co-defendants and victims in [his] case [were] in [his] living area; there could possibly be trouble."  Exhibit A to defendants' memorandum (document no. 129-2).  Accordingly, plaintiff was temporarily moved from Unit 2C to Unit 1A while staff investigated the basis for his concern.  For various reasons related to his criminal and institutional history, plaintiff was only eligible for housing in medium security (or higher) units under the institution's classification system.  After investigating plaintiff's vague claims about safety concerns, HCHC staff concluded that he was not eligible for protective custody status.

On October 5, 2004, plaintiff was informed of the decision to reclassify him to Unit 2B.  But, given his security concerns, he was told that he would be housed alone in a cell and would have his out of cell time scheduled when no other inmates were out of their cells.  Despite the staff's effort to address his concerns (at least partially), De Angelis was clearly displeased and refused to be relocated.  Additional officers were summoned and plaintiff threatened to hurt himself and claimed he was going to have a "psychological emergency" once he was moved to the new cell.  The details of this series of events are set forth in defendants' memorandum, as well as the accompanying affidavits of the corrections officers involved.  It is sufficient to note that, at some point, plaintiff began striking his head against the cell's cement wall, then a desk, and finally the floor and the bunk.  See Plaintiff's testimony from February 16, 2005 injunction hearing (describing his efforts to harm himself) (document no. 129-8).

Ultimately, De Angelis was restrained and placed in a restraint chair.  After he told the officers he had hepatitis and spit out blood from a cut on his mouth, the officers called for a "spit net."  While waiting for the net to arrive, the officers located plaintiff's T-shirt and placed it over his head, to

prevent him from spitting on them.  When the spit net arrived, the shirt was removed and plaintiff was transported to the "safety cell" – a cell with no fixtures in it.

Because plaintiff was naked when he began his violent outburst, he remained unclothed while he was held in the restraint chair.  He was, however, evaluated at least every 15 minutes by corrections officers.  Additionally, his status was evaluated every 30 minutes by the Sergeant on duty and every 60 minutes by the Lieutenant.  All officers involved in monitoring plaintiff's status were required to complete a "Restraint Watch Form," which is attached to defendants' memorandum as Exhibit K (document no. 129–12).  Plaintiff remained in the restraint chair for approximately two and one-half hours, during which time he was evaluated more than 20 times by staff members.

At 15:15 (3:15 p.m.), plaintiff informed one of the corrections officers that he wished to use the bathroom.  Because he had not yet been quiet and calm continuously for 60 minutes (an institutional prerequisite for release from the restraint chair), that request was denied.  Fifteen minutes later, at 15:30, after he had remained calm and quiet for a period of 60 minutes, plaintiff was removed from the chair.

6

One of plaintiff's Eighth Amendment claims arises from his assertion that various corrections officers used excessive force against him while trying to prevent him from harming himself and securing him in the restraint chair.  The other arises from his assertion that he was forced to remain in the restraint chair, without an opportunity to use the bathroom.  As a consequence, he says he defecated and voided on himself and was forced to sit in urine and feces for "the entire time [he spent] in the chair."  See Complaint (document no. 4) at 6.  See also Report and Recommendation at 9.

II.  The November 17, 2004 Transfer and Subsequent Incidents.

On November 17, 2004, plaintiff again attempted to injure himself.  Accordingly, he was placed on a medical watch and transferred to the medical unit – Unit 1C.  He remained there until November 30, 2004, at which time he again requested protective custody.  As before, however, he failed to specifically identify why he felt threatened or the other inmates he believed posed a risk.  He simply declared that he would feel "unsafe" if he were placed in Units 2B, 2C, or 2D.  His request was denied and he was moved to Unit 2B.

7

A few days later, under somewhat suspicious (or, at a
minimum, unusual) circumstances, plaintiff reported that he had
been the victim of threatening conduct.  He said another
(unidentified) inmate had thrown a shampoo bottle containing
urine under his cell door that slid in such a way as to land in
his property box under his bunk and spill on his papers.  Based
on that alleged incident, De Angelis asked to be moved to another
housing unit.  After investigating the alleged incident, Sergeant
Dalton concluded that the bottle could not have entered the cell
and spilled the way De Angelis described.  Additionally, inmate
witnesses interviewed by Dalton reported that De Angelis had
staged the incident in an effort to secure a transfer.  Dalton
requested a disciplinary hearing, and his report was reviewed and
approved by Lieutenant Gerard Morrissette, the shift commander.
De Angelis was subsequently written up and, eventually, found
guilty of having lied to a corrections officer.

Plaintiff also claims corrections officers subjected him to
unwarranted discipline in retaliation for his having filed this
lawsuit against them.  He claims, as well, that they transferred
him to Unit 2B knowing that he was likely to be threatened and/or
assaulted by other inmates in that cell block and, by so doing,
failed to protect him from a known threat.

III. <u>Alleged Incidents of Retaliation</u>.

Plaintiff asserts that various defendants retaliated against him for having filed this lawsuit by pursuing unwarranted and/or wholly fabricated disciplinary charges.  He also claims that his various transfers within the jail were undertaken as a means by which to retaliate against him.  The details underlying those transfers and disciplinary charges are summarized in the Report and Recommendation and are set forth in more detail in defendants' memorandum.  Accordingly, they need not be recounted in this opinion.

**Discussion**

I.   <u>Summary Judgment</u>.

A.   <u>Excessive Force</u>.

Because De Angelis was a pretrial detainee at the time of the incidents that give rise to his complaint, his claims are governed by the Fourteenth, rather than the Eighth, Amendment.  <u>See</u> <u>Ruiz-Rosa v. Rullan</u>, 485 F.3d 150, 155 (1st Cir. 2007); <u>Surprenant v. Rivas</u>, 424 F.3d 5, 18 (1st Cir. 2005).  <u>See also</u> <u>Carr v. Deeds</u>, 453 F.3d 593, 605 (4th Cir. 2006) ("Excessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment.").  Whether the force used was excessive depends on whether it "was applied in a good-

9

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992); accord Carr, 453 F.3d at 605-06; Fuentes v. Wagner, 206 F.3d 335, 347 (3d Cir. 2000). In addition, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n.3 (1st Cir. 1990).

De Angelis alleges that on October 5, 2004, he was assaulted in his cell by Sergeant Gordon and Officers Leduc and Beaudoin. He contends that Officer Torres was present but did nothing to stop the assault. He admits, however, that he was trying to physically hurt himself – that he repeatedly slammed his head against the wall, into the desk, and into the floor. Leduc, Beaudoin, Gordon, and Torres each provide an affidavit that describes the circumstances and their responses.[1]

---

[1]     The jurat for Lieutenant Gordon's affidavit states that Steve Beaudoin, rather than Gordon, took the oath in support of that affidavit. That mistake, which is presumably a typographical error, renders the affidavit ineffective. See Fed. R. Civ. P. 56(e). And, although the affidavit states that a copy of Gordon's report is attached, it is not.

10

The competent evidence provided by the defendants establishes that their actions were within the range of force reasonably necessary to address De Angelis's admittedly self-destructive and violent behavior.  Nothing in the record suggests that the defendants were acting sadistically or maliciously. Instead, the undisputed facts support the defendants' claim that they were acting in good faith to keep De Angelis from causing further injury to himself.  Rather than willfully and wantonly subjecting plaintiff to unnecessary pain, the record demonstrates that corrections officers acted reasonably and promptly to restrain plaintiff and prevent him from injuring himself.  For example, while De Angelis was struggling with the officers and violently attempting to hit his head on the wall, desk, floor, and bunk, one of the officers placed his hand on plaintiff's forehead so that when plaintiff slammed his head into an object, the officer's hand would cushion the blow.  <u>See</u> Affidavit of Corrections Officer John Leduc (document no. 129-5) at para. 11.

Defendants Gordon, Leduc, and Beaudoin are, then, entitled to summary judgment as to De Angelis's excessive force claims. And, in the absence of excessive force, Torres could breach no duty to protect De Angelis from that harm.

B.   Unsanitary Conditions.

De Angelis alleges that while he was strapped into the restraint chair, Gordon and Robbins repeatedly denied his requests to use the bathroom.  As a result, De Angelis claims he was forced to defecate and urinate in the chair and to sit in urine and feces for two hours.  He contends that experience constitutes inhumane conditions of confinement in violation of the Eighth Amendment.

As is the case with De Angelis's excessive force claims, "[a] pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests."  Surprenant, 424 F.3d at 18.  To establish that claim, a plaintiff first must prove that objectively "the conditions of his confinement deny him the minimal measure of necessities required for civilized living."  Id.  Second, the plaintiff must show that the defendant, subjectively, was deliberately indifferent to his health or safety.  Id. at 18–19.

According to De Angelis's complaint, he asked to use the bathroom soon after he was secured in the restraint chair, and when that request was denied, he sat in his own waste for the

12

remainder of his confinement in the chair.  Lieutenant Robbins
states in his affidavit that he checked De Angelis at the end of
the confinement, when he gave the order to release him, and there
was no sign that he had defecated or urinated (plaintiff was not
wearing any clothing at the time, so it would have been quite
obvious if he had relieved himself while in the restraint chair).
In fact, all defendants involved in the incident deny that
plaintiff defecated or urinated on himself.  <u>See</u> Defendants'
memorandum at 25-26.  They also point out that plaintiff never
grieved the incident.  <u>Id</u>.  And, the watch form shows that De
Angelis asked to use the bathroom for the first (and only) time
just fifteen minutes before he was released from the chair.  <u>See</u>
Watch Form (document no. 129-12) at 1.

     Consequently, plaintiff's assertion in his complaint that he
repeatedly requested, but was denied, access to the bathroom and,
as a consequence, was forced to sit in his own urine and feces
for nearly two hours, is entirely without factual support.  Based
on the record facts, Robbins and Gordon did not subject De
Angelis to unconstitutional conditions of confinement and are
entitled to judgment as a matter of law as to plaintiff's claim
that they violated his Eighth Amendment rights by forcing him to
endure unsanitary conditions of confinement.

C.   <u>Failure to Protect</u>.

The factual allegations underlying plaintiff's failure to protect claim are, much like his repeated requests for protective custody, vague and ill-defined.  As the Magistrate Judge noted, plaintiff has not described any physical injuries caused by defendants' (alleged) decisions to knowingly (and repeatedly) put him in harm's way.  <u>See</u> Report and Recommendation at 13.  In his complaint, plaintiff alleges that, shortly after his transfer on November 17, 2004, he was twice assaulted by other inmates, received "numerous threats," and suffered from depression as a result of the attacks.

As noted above, De Angelis was a pretrial detainee when the events in question occurred.  Accordingly, the constitutional obligations owed to him by HCHC officials flow from the provisions of the Fourteenth, rather than the Eighth Amendment.  Nevertheless, the protections available to pretrial detainees under the Fourteenth Amendment "are at least as great as the Eighth Amendment protections available to a convicted prisoner." <u>City of Revere v. Massachusetts Gen. Hosp.</u>, 463 U.S. 239, 244 (1983) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)).  <u>See generally</u> <u>Calderon-Ortiz v. Laboy-Alvarado</u>, 300 F.3d 60 (1st Cir. 2002).

14

As the Supreme Court has observed, the "Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citation and internal punctuation omitted).  Among other things, the Constitution imposes on prison officials the obligation to "protect prisoners from violence at the hands of other prisoners."  Id. at 833 (citation omitted).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  Id. at 834. Rather, liability attaches only when two requirements are met:

> First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities.  For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind.  In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.

Id. at 834 (citations, footnote, and internal punctuation omitted).

Under the second part of that two-part test, the plaintiff must demonstrate that the defendant was more than merely negligent.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 106 (1976).  In other words, a prison official "cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  The test is, then, a subjective one.  And, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact." Id. at 842.

While a corrections officer's alleged deliberate indifference to a serious risk of substantial harm presents a question of fact, that does not necessarily mean that a defendant can never prevail on a motion for summary judgment.  For example, a defendant might demonstrate that, based upon the alleged assailant's prior exemplary behavior within the correctional facility, no reasonable trier of fact could conclude that the defendant should have known that the assailant posed an "excessive risk to inmate health or safety."  Farmer, 511 U.S. at

16

837.  Alternatively, an inmate's request for protective custody may be so vague and non-specific that it renders it difficult, if not impossible, for corrections officials to understand the nature of the perceived threat and, as a consequence, the means by which to reduce or eliminate that threat.

So, to avoid summary judgment in a case such as this, the plaintiff must point to facts from which the defendants might reasonably have inferred that a particular inmate or inmates posed a substantial threat to plaintiff's safety, thereby warranting some preventative measures on the part of prison authorities.  Simply positing that a cell transfer request was made before an assault occurred is not, standing alone, sufficient; it does not compel the conclusion that such a transfer was needed to protect the inmate's safety, nor does it necessarily suggest that corrections officers recognized, but were indifferent to, the need for a protective transfer.  In other words, corrections officers do not violate the Constitution every time they deny a cell transfer request and an inmate is subsequently assaulted by another inmate.  As noted above, not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S.

17

at 834.  For liability to attach in cases like this one, the
plaintiff must proffer evidence from which it could be found that
a corrections officer was aware of, but consciously disregarded,
an excessive risk to plaintiff's safety.

Here, due largely to his virtual silence in response to
defendants' motion for summary judgment, De Angelis has failed to
point to any facts which, if credited as true, would support his
claim that any defendant was deliberately indifferent to his
serious security needs.  Among other things, plaintiff's requests
for protective custody were vague and failed to identify which
inmate or inmates posed a potential threat to him, or why.  <u>See</u>
Plaintiff's Requests for Protective Custody (documents no. 129-2
and 129-13).  <u>See also</u> Affidavit of William Raymond (document no.
129-4) at para. 14 (stating that De Angelis never identified any
threat against him that would provide a basis for protective
custody).

Viewing the record in the light most favorable to plaintiff,
and charitably construing any inferences that might be drawn in
his favor, at the very most a reasonable trier of fact might be
able to conclude that one or more defendants was negligent in
failing to credit plaintiff's general claims and refusing to

18

honor his requested transfer.  Such a conclusion would not, however, allow a jury to rule in plaintiff's favor.  As noted above, De Angelis must demonstrate that one or more defendants was deliberately indifferent to a known security threat; proof of mere negligence is insufficient.

      D.   <u>Retaliation</u>.

De Angelis alleges that Supervisor Raymond, Captain Dionne, and Sergeant Boyer transferred him to maximum security in September and again in November of 2004, in retaliation for filing this lawsuit.  He also alleges that Sergeant Dalton falsified a disciplinary report against him about the shampoo bottle incident on December 3, 2004, and Lieutenant Morrissette approved the false report to retaliate against him for this suit. In addition, he alleges that his legal materials were taken and destroyed because Captain Dionne lied about having given him permission to pass materials to other inmates and that Dionne threatened him, all in retaliation for this lawsuit.  The defendants contend that they are entitled to summary judgment on those claims.

To prove retaliation in violation of the First Amendment, a plaintiff must show that his "'conduct was constitutionally

protected, and that this conduct was a "substantial factor" [or] . . . a "motivating factor"' driving the allegedly retaliatory decision." <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 10 (1st Cir. 2005) (quoting <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)). Prisoners have a First Amendment right to petition the courts for a redress of grievances. <u>Bounds v. Smith</u>, 430 U.S. 817, 821-22 (1977). Protected conduct is the motivating factor for retaliatory action if the defendant would not have taken that action "but for" the protected conduct. <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979) (construing <u>Mt. Healthy</u>).

The protected conduct De Angelis asserts is that he filed and has maintained this lawsuit. Although he filed a certificate of custodial institution on October 19, 2004, he did not file his complaint identifying the defendants until November 29, 2004. Consequently, absent some evidence that defendants were actually aware of plaintiff's intent to file suit against them (of which there is none), any actions taken before November 29, 2004, could not have been in retaliation for a lawsuit that had not yet begun. Therefore, De Angelis's retaliation claims against Raymond, Dionne, and Boyer based on his security classification

and housing transfers in September and November lack evidence of
a retaliatory motive.

The disciplinary report by Sergeant Dalton, which was
approved by Lieutenant Morrissette, arose from De Angelis's story
about a shampoo bottle of urine having been thrown into his cell
on December 3.  In his affidavit filed in support of summary
judgment, Sergeant Dalton provides detail about his investigation
of that incident, including De Angelis's refusal to provide
essential information, that is not disputed.  De Angelis was
administratively found guilty of lying to an officer about that
incident.  No evidence exists in the record to support De
Angelis's claim that the disciplinary report was falsified in
retaliation for his filing this suit.  Instead, the undisputed
evidence of record supports the administrative discipline imposed
upon him for having lied to a corrections officer.

De Angelis's retaliation allegations against Captain Dionne
in the August 3 amended complaint are based on De Angelis's
misunderstanding of the permission he was given.  Dionne
authorized De Angelis to ask other inmates to provide statements,
that could be written during their out-of-cell time.  De Angelis
misinterpreted that response as allowing him to give his legal

materials to other inmates.  Contrary to the permission given, De
Angelis gave other inmates his legal materials that they then
kept in their cells, which the defendants have shown is a
violation of the jail's policy.  Given Dionne's unrebutted denial
that he gave De Angelis permission to share his legal materials
with other inmates, the confiscation of those materials amounted
to little more than an appropriate enforcement of jail policy.
No evidence exists in the record to support De Angelis's claim
that those actions were taken in retaliation for this lawsuit.


II.  <u>Motion to Dismiss for Lack of Proper Service</u>.

        Superintendent James O'Mara and Lieutenant John Sullivan
were named as defendants to this action in plaintiff's second
amended complaint (document no. 137).  But, De Angelis never
served those individuals with a copy of his complaint.  And, say
O'Mara and Sullivan:

>   Despite clear notice that Lt. Sullivan and Mr. O'Mara are
>   not proper defendants in this matter, Plaintiff has never
>   attempted to cure the deficiencies in service by mailing
>   them the amended complaint, requesting a waiver of service,
>   or filing any pleading, letter, or notice with the Court
>   requesting assistance.
>
>   This case has gone on now for over two and a half years
>   during which one hundred and thirty-six (136) pleadings
>   and orders have been filed, as well as volumes of
>   discovery provided to plaintiff (sometime duplicates of
>   same per Plaintiff's request) and multiple hearings

        have been held.  Discovery is now complete as are
        dispositive motion.

Defendants' memorandum at 4-5.


        Based on those representations, and invoking Rules 4(m) and
41(b) of the Federal Rules of Civil Procedure, O'Mara and
Sullivan moved to dismiss plaintiff's claims against them, with
prejudice.  Plaintiff has not filed an objection or otherwise
responded.


        While it is true that this case has been pending for more
than two years, it is not clear that plaintiff actually realized
that he had failed to properly serve O'Mara and Sullivan (at
least until the other defendants referenced that issue in their
motion for summary judgment).  The numerous letters from defense
counsel to plaintiff (copies of which are appended to the motion)
do not reveal that counsel ever specifically informed De Angelis
of his failure to properly effect service.  Nor at any time
during that two year period did O'Mara and/or Sullivan move to
dismiss for lack of proper service.  Nor is there evidence to
suggest that De Angelis actually failed to prosecute his claims;
instead, discovery proceeded according to plan and (presumably)
he simply awaited his trial.  Finally, there is no evidence that

O'Mara and Sullivan have been prejudiced by plaintiff's failure to properly serve them.

Pursuant to Rule 4(m), the motion to dismiss is granted to the extent it seeks dismissal of plaintiff's claims against O'Mara and Sullivan, without prejudice.  To the extent O'Mara and Sullivan seek dismissal of plaintiff's claims pursuant to Rule 41(b) <u>with</u> prejudice, their motion is denied.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment (document no. 127) is granted.  The motion to dismiss filed by Superintendent O'Mara and Lieutenant Sullivan (document no. 138) is granted in part and denied in part.  It is granted to the extent movants seek the dismissal of plaintiff's claims against them without prejudice.  In all other respects, it is denied.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

January 22, 2008

cc:  Michael De Angelis, pro se
     Carolyn M. Kirby, Esq.
     John A. Curran, Esq.
     Elizabeth L. Hurley, Esq.